Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

## MEMORANDUM OPINION

No. 04-08-00335-CR

Lee **MENDOZA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-9290
Honorable Juanita A. Vasquez-Gardner, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Catherine Stone, Chief Justice
Karen Angelini, Justice
Phylis J. Speedlin, Justice

Delivered and Filed:   March 25, 2009

AFFIRMED

Lee Mendoza was convicted of two counts of aggravated robbery. On appeal, he claims the

evidence was legally insufficient to sustain his conviction. We find the evidence sufficient and affirm

the trial court's judgments.

**DISCUSSION**

A.     *Standard of Review*

In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and then determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 729-30 (Tex. Crim. App. 2005).

B.     *The Evidence*

*Bernice Rios*

On December 6, 2005, Bernice Rios was working as an assistant manager at the Las Palmas Payless Shoe Source. She arrived at work at 3:30 p.m., but had to leave the store at 3:45 p.m. to pick up her daughter. As she was about to leave, she observed a person, whom she later identified as Mendoza, come into the store. Then, as she left the store, she noticed a green car in the parking lot with a man in it. The man appeared to be waiting for someone. Rios became suspicious:

> When I walked out, I went into my truck, and I noticed that there was a – a car waiting, you know, with a guy in it. There was nobody in the store. So I guess working with Payless so long you have those instincts, you know, where we've had people [—] somebody's waiting for them in the car. They go in, take shoes, and they run out in the car. So before I left, I went back into the store, and I told my – my boss was helping him, and I told my boss I think somebody's waiting out there for him [Mendoza]. And, she said okay.

Mendoza then picked up some shoes. Rios's boss explained a sock promotion to Mendoza, which appeared to confuse Mendoza. According to Rios, Mendoza then told her and her boss, "Don't worry. I don't have nothing [sic]. You don't have to be scared." Rios responded that she was not scared. The person who had been waiting in the car then came into the store and told Mendoza to hurry because he had to pick someone up at four o'clock. Mendoza then asked what time the store closed and was told nine o'clock. Mendoza said he would be back for his shoes later and left.

According to Rios, Mendoza was looking at size ten and a half or eleven shoes. Mendoza was wearing a blue windbreaker and khaki pants.

Later that evening at about 8:30 p.m., Rios and her co-worker, Angelica Gonzalez, were putting shoes back and straightening up the store when Mendoza walked in. Rios told Gonzalez that Mendoza had been in earlier to get some shoes, but that she had put them back on the shelf. Gonzalez then went to help him. Mendoza was wearing khaki pants, a gray pullover, a hat, and a blue bandana tied on his head. Rios had a bad feeling about the man, so she went to the back office and called security. Gonzalez and Mendoza then walked up to the register, and Mendoza pulled a gun on Gonzalez. Rios pressed the panic button that was in her pocket, and Mendoza then came toward her with the gun. Mendoza was going to grab her arm, but she told him her arm was broken. He said he was not going to hurt her, but asked her to come to the register. Mendoza told Gonzalez to open the register, but Gonzalez could not open it. Rios was able to open it, and then the security guard came in. Mendoza pointed the gun at the security guard and told him to get on the ground. The guard complied. Mendoza took the gun out of the guard's holster. Rios then took the money and put it in a bag. Mendoza got the money and the shoes, and ran out of the store. Although there is video surveillance in the store, the batteries were corroded so there were no pictures. On the night of the robbery, Rios told the police that the robber was 5' 8" and 170 pounds. A month later, however, she said he was 5' 3" to 5' 4". She also described him as Hispanic, young, and having a stutter.

Sometime in January, Rios saw a man whom she thought was the man who robbed her. In fact, she saw him on about three occasions. According to Rios, she wanted to make sure it was the man, but she did not know how to do it. So, she told a police officer, who said that if she ever saw the man again, she should call the police. Thus, when Rios saw the man again, she called the police.

When the police responded, Rios gave them a description of the man and told them the direction in which the man was walking. The police then stopped a man who fit Rios's description, a man in khaki pants and blue shirt. The officer told Rios the man was mentally retarded. Rios asked the officer if the man stuttered, and the officer responded that he did. Shortly after that, Rios was shown a photo line-up. She identified Mendoza as the man who robbed her. According to Rios, there is no doubt in her mind that the man she identified is the man who robbed her.

*Angelica Gonzalez*

On December 6, 2005, Angelica Gonzalez was working as a manager at the Las Palmas Payless Shoe Source. At about 8:45 p.m., she and her assistant manager, Bernice Rios, were preparing to close the store when a man came in and asked her to help him with some shoes. He was looking for shoes in a size ten or eleven. The man put some shoes and socks on the counter and, as Gonzalez rang up his purchases on the register, the man pulled a gun on her. He told her to put the money and the shoes in a sack. Gonzalez told him she would have to call the manager to open the register. She then called for Rios to come. Rios, who had a broken arm, kept telling the man not to touch her because of her broken arm. Rios started crying and then opened the register and gave him the money. Before the man was able to leave, a security officer came in, but the man took the officer's gun and made him lie on the floor. The man, who was Hispanic, was wearing baggy blue jeans, a T-shirt, a hat, and a bandana covering his eyes and forehead. He spoke both English and Spanish at the same time, and he stuttered when he spoke. The man was not aggressive, and he appeared both calm and nervous. After the man left the store, he got into a green car, which was driven by another individual.

Gonzalez gave a statement to police about the incident, and in January 2006, she identified the man who pointed the gun at her from a set of photographs. According to Gonzalez, she was 100% sure the man in the picture was the man who pointed the gun at her. There was no doubt in her mind about her identification. The man whom Gonzalez identified in the photographic line-up was Mendoza. At trial, however, Gonzalez was unable to identify the defendant, Mendoza, as the man who pulled the gun on her. Gonzalez testified at trial that she was scared to be in court and that the only reason she came was because she received a subpoena. Additionally, Gonzalez testified that because she was scared, she had quit her job, sold her car, and moved away from San Antonio.

*Rafael Martinez*

On the day of the robbery, Rafael Martinez was the security guard on duty. Martinez responded to a call from Payless. According to Martinez, when he walked into the door of Payless, he saw two women and a man. The man pointed a gun at him and told him to lie down. Martinez lay down on the floor, and the man removed Martinez's gun from its holster. The man then got the money from the cash register, left the store, and got into an older model green Monte Carlo or Grand Prix. Martinez then called the police. Later, when Martinez was shown a photographic line-up, he was unable to identify the man who pointed the gun at him. According to Martinez, he did not believe he would be able to identify the man because, in his job as security officer, he looks at a lot of pictures of shoplifters so that he can watch for them in stores. At trial, Martinez was also unable to identify the defendant, Mendoza, as the man who pointed the gun at him. When Martinez gave his statement to the police, he described the suspect as weighing 170 to 180 pounds, about 5' 6" in height, and in his twenties to early thirties.

*Greg Andrade*

Greg Andrade is the San Antonio police officer who responded to the robbery in progress call from Payless. When Andrade arrived, he talked to the security guard and two women, who reported they had been robbed at gunpoint. Andrade interviewed the witnesses and made a report indicating the robber wore a long sleeve blue or gray shirt or sweat shirt, tan pants, a black baseball cap, and a blue cloth. The gun was an automatic handgun. The witnesses described the man as a Hispanic male, about thirty years old, and about 5' 8" and 170 pounds. On January 25, 2006, Andrade was called back to the Payless because one of the women who had been robbed, Bernice Rios, reported that she had seen a man who looked like the robber walking in the area. When the man walked away, Rios followed him and got an address for his location. When Andrade went to this address, he found Mendoza and a green vehicle. Andrade then transported Mendoza and Mendoza's mother to the police substation for an interview.

*James Foster*

James Foster is a robbery detective with the San Antonio Police Department and was the follow-up detective on the Payless robbery. According to Foster, on January 25, 2006, he received a call reporting that an officer had located a possible suspect in the Payless robbery. Foster drove to the address given and made contact with Mendoza. Foster told Mendoza that somebody had called and said Mendoza may be responsible for a robbery that had occurred in December. Although Foster did not mention the robbery had taken place in a shoe store, Mendoza stated he did not rob a shoe store. However, according to Foster, he did not know whether Andrade had told Mendoza they were questioning Mendoza about a shoe store robbery. Mendoza was then transported to the police substation where his picture was taken. Mendoza was not arrested at that time because he had not

yet been identified as the robber. A photographic line-up was prepared and shown to the witnesses. Foster presented the line-up to the security guard, but the guard was unable to make an identification. However, because two other witnesses identified Mendoza as the robber, Foster filed a case against Mendoza.

*Patricia Villegas*

Patricia Villegas is a sergeant with the San Antonio Police Department. She assisted her partner in the case by presenting line-ups to both Rios and Gonzalez. According to Villegas, when she presented the photographic line-up, which consisted of six pictures, to Rios at the Payless store, Rios immediately recognized the man who robbed her and identified the picture of Mendoza. When Villegas presented the photographic line-up to Martinez at the police substation, Martinez also identified Mendoza as the robber. Both witnesses were sure about their identification of Mendoza as the robber.

*Humberto Maldonado*

Humberto Maldonado is a home-visiting counselor who has visited with Mendoza about once a week for about six years, from about 1996 to about 2002. However, at the time of the robbery, Maldonado was not seeing Mendoza. Maldonado observed Mendoza to be very shy, passive, and withdrawn. According to Maldonado, Mendoza could not maintain eye contact and was not aggressive or violent. Mendoza would avoid the streets, only walking two blocks to the store and to run errands. When Maldonado heard about the charge against Mendoza, he was shocked and stunned. Based on his experiences with Mendoza, he believed Mendoza was not that type of person. Further, according to Maldonado, Mendoza was on SSI benefits and had no need for that type of

money. Maldonado did not think Mendoza would have the guts to rob a store at gunpoint. According to Maldonado, Mendoza has the mental age of a ten-year-old child.

*Guadalupe Mendoza*

Guadalupe Mendoza is the mother of the defendant, Mendoza. According to Ms. Mendoza, her son is innocent, is like a child, and is not the type of person who could commit a crime like the one charged. According to Ms. Mendoza, although Mendoza would walk to the store, most of the time she went with him because Mendoza is shy and afraid to talk to people. Ms. Mendoza testified that Mendoza goes to the H.E.B. almost every day and that he has to pass Payless to get there.

When Mendoza was about eighteen or nineteen, he started receiving social security benefits. Before that, however, he was getting medical treatment for his condition. At one time, he saw a psychiatrist because he was hallucinating. Ms. Mendoza was not aware of any medical records that indicate Mendoza was violent.

Ms. Mendoza testified that she first found out about the accusations against her son when a police officer came to her house on January 25, 2006. She went with Mendoza to the police station, where they took fingerprints and a photograph, and then released him. The police came back the following August and again in November when they arrested him.

Ms. Mendoza testified that she had taken Mendoza into the Payless before to look at shoes. According to Ms. Mendoza, her son wears a size nine. Further, Ms. Mendoza testified that her son never goes out at night because he is afraid.

*Gilbert Mendoza*

Gilbert Mendoza is Mendoza's father. He described his son as very humble, shy, and truthful. According to Mr. Mendoza, his son believes in God, prays, and goes to church. His son has never

done anything wrong to anybody and has been a good son. Mr. Mendoza testified that his son is not capable of committing robbery.

*Lee Mendoza*

The defendant, Lee Mendoza, testified that he has never been to Payless without his mom, nor was he at the Payless store on December 5, 2006. He did not recognize Gonzalez, Rios, or Martinez. Further, he has never owned a gun, nor has he ever held one. In fact, according to Mendoza, he is afraid of guns and firecrackers. Mendoza testified that he wears a size nine shoe, is on disability, and does not go out at night because it is dangerous. Mendoza graduated from high school as a special education student because he was a slow learner. And, Mendoza testified that he did not commit the crime with which he is charged.

Mendoza testified that he speaks both Spanish and English, but prefers English. He sometimes mixes them together. He has been diagnosed as schizophrenic. His brother, Gabriel, drives a light green car. Mendoza weighs 130 and is 5' 4".

*Legal Sufficiency of the Evidence*

In one issue on appeal, Mendoza argues the evidence is legally insufficient to support his convictions for aggravated robbery. Specifically, Mendoza contends that this is a case of mistaken identity; that is, the evidence is not sufficient to identify him as the person who committed the aggravated robbery. In making this argument, Mendoza points out that Rios, who was the only witness to conclusively identify Mendoza at trial, was so unsure of the robber's identity that she observed him three times after the robbery before reporting it to the police. Further, Mendoza describes some inconsistencies in Rios's testimony, including the fact that, although Rios described Mendoza as 5' 8" immediately after the robbery, he is, in fact, 5' 4". And, according to Mendoza,

because Rios testified that she did not know where Mendoza lived, there is some question regarding how the police discovered where he lived.

Additionally, Mendoza points out that Martinez gave a physical description of the robber that varied from Mendoza's actual characteristics. Martinez described the robber as 5' 8" and 170 pounds, whereas Mendoza is 5' 4" and weighs only 130 pounds. Further, Martinez was unable to identify Mendoza.

Although there is some conflicting evidence and there are some inconsistencies in the testimony of the witnesses, there is, nevertheless, legally sufficient evidence to support the jury's verdict. Considering the evidence in the light most favorable to the verdict, the jury could have found the essential elements of aggravated robbery beyond a reasonable doubt. And, specifically, the evidence is sufficient to support a finding that Mendoza was the individual who robbed Martinez and Rios at gunpoint in the Payless store. *See Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (finding testimony of eyewitness alone sufficient to support jury's verdict); *Rodriguez v. State*, No. 04-00-00399-CR, 2002 WL 461379, at *3 (Tex. App.—San Antonio 2002, no pet.) (holding evidence legally sufficient where four eyewitnesses identified defendant as perpetrator even though testimony was not flawless) (not designated for publication).

Both Gonzalez and Rios identified Mendoza in a photographic line-up about two months after they were robbed at gunpoint. Rios had actually seen Mendoza in the store earlier that day, only to witness his return later that evening when he committed the robbery. Both Gonzalez and Rios were absolutely certain of their identifications of Mendoza in the photographic line-up. Rios also identified Mendoza at trial. Further, witnesses described Mendoza as speaking both English and Spanish at the same time and having a stutter. Mendoza's mother confirmed these characteristics

about her son. Finally, the witnesses related seeing a green car in the parking lot when Mendoza was in the store both earlier in the day and after the robbery. It was later discovered that Mendoza's brother drives a green car.

Thus, we find the evidence is legally sufficient to support the jury's verdict and affirm the trial court's judgments.

Karen Angelini, Justice

Do not publish